24-10583

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff Appellee,*

V.

LUIS EDUARDO NAVARRETE,
*Defendant Appellant.*

On Direct Appeal from the United States District Court
for the Northern District of Texas
Dallas Division

## APPELLANT'S INITIAL BRIEF

JASON D. HAWKINS
FEDERAL PUBLIC DEFENDER

*s/ Maria Gabriela Vega*
**M. GABRIELA VEGA**
ASSISTANT FEDERAL PUBLIC DEFENDER
Tex. Bar No. 24084014
525 S. Griffin St., Ste. 629
Dallas, TX 75202
(214) 767-2746
Gabriela_Vega@fd.org
*Counsel for Luis Eduardo Navarrete*

## CERTIFICATE OF INTERESTED PERSONS

I certify that the following listed persons and entities have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualifications or recusal.

| | |
|---|---|
| **District Judge:** | The Honorable Ed Kinkeade |
| **Magistrate Judge:** | The Honorable Irma Carrillo Ramirez |
| **Appellant:** | Luis Eduardo Navarrete |
| **Federal Public Defender Northern District of Texas:** | Jason D. Hawkins |
| **Defense Counsel:** | Maria Gabriela Vega Zainab Khan John M Nicholson |
| **United States Attorney Northern District of Texas:** | Leigha Simonton |
| **Assistant U.S. Attorneys:** | Stephen Gilstrap Phelesa Guy Katie Carr Jacobs Rick Alan Calvert |

*s/ Maria Gabriela Vega*
**M. GABRIELA VEGA**

## STATEMENT REGARDING ORAL ARGUMENT

Luis Eduardo Navarrete requests oral argument. This appeal concerns the outer limits of a court's discretion to punish a defendant for a death the defendant did not cause and in which he otherwise played no personal role.

# TABLE OF CONTENTS

Certificate of Interested Persons ...............................................ii

Statement Regarding Oral Argument ................................... iii

Table of Contents.............................................................iv

Table of Authorities ......................................................... v

Statement of Jurisdiction................................................... 1

Issue Presented For Review................................................. 2

Statement of the Case ...................................................... 3

Summary of the Argument .................................................. 14

Argument ................................................................. 15

    I.    Standard of review: This Court will determine if the
district court abused its discretion.............................. 15

    II.   Point of error: The district court improperly punished
Navarrete for causing V.D.'s death............................ 16

Conclusion................................................................. 25

Certificate of Service ...................................................... 26

Certificate of Compliance .................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Burrage v. United States*,
    571 U.S. 204 (2014) ................................................................ 19

*In re Fisher*,
    649 F.3d 401 (5th Cir. 2011) ......................................... 21, 22

*Gall v. United States*,
    552 U.S. 38 (2007) ...................................................... 15, 16

*Holguin-Hernandez v. United States*,
    589 U.S. 169 (2020) ............................................................ 15

*United States v. Bostic*,
    970 F.3d 607 (5th Cir. 2020) ............................................. 15

*United States v. Gerezano-Rosales*,
    692 F.3d 393 (5th Cir. 2012) ............................................. 16

*United States v. Greenough*,
    669 F.3d 567 (5th Cir. 2012) ............................................. 20

*United States v. Hoffman*,
    901 F.3d 523 (5th Cir. 2018) ............................................. 16

*United States v. Hudgens*,
    4 F.4th 352 (5th Cir. 2021) .......................................... 18, 19

*United States v. Mathes*,
    839 F. App'x 879 (5th Cir. 2021) ................................. 15, 16

*United States v. Smith*,
    440 F.3d 704 (5th Cir. 2006) ............................................. 16

*United States v. Thompson,*
945 F.3d 340 (5th Cir. 2019)...................................................................... 20

*United States v. Warren,*
720 F.3d 321 (5th Cir. 2013)...................................................................... 15

**Federal Statutes**

18 U.S.C. § 924(c)(1)(A)(i) ............................................................................3

18 U.S.C. § 3231 ............................................................................................ 1

18 U.S.C. § 3553(a)(1) ................................................................................ 23

18 U.S.C. § 3661 .......................................................................................... 23

18 U.S.C. § 3742 ............................................................................................ 1

21 U.S.C. § 841 ............................................................................................ 19

21 U.S.C. § 841(b)(1)(B) ............................................................................. 19

28 U.S.C. § 1291 ............................................................................................ 1

**United States Sentencing Guidelines**

USSG §2D1.2 ................................................................................................ 6

USSG §2K2.0 ................................................................................................ 6

USSG §3D1.2 ................................................................................................ 6

USSG §4A1.3(a)(2)(D) ................................................................................. 6

USSG §5K2.1 .......................................................................................... *passim*

USSG §5K2.2 ................................................................................................ 7

**Rules**

Fᴇᴅ. R. Aᴘᴘ. P. 4(b)(1)(A)(i) ...................................................................... 1

## STATEMENT OF JURISDICTION

This is a direct appeal from a sentence imposed in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

The district court entered its judgment on June 26, 2024. ROA.88–94. Navarrete filed a timely notice of appeal on June 27, 2024. ROA.95. *See* FED. R. APP. P. 4(b)(1)(A)(i).

## ISSUE PRESENTED FOR REVIEW

Whether the district court improperly punished Navarrete for causing

V.D.'s death?

## STATEMENT OF THE CASE

On February 2, 2023, the government filed a criminal complaint against Luis Eduardo Navarrete and Magaly Mejia Cano for participating in a fentanyl drug conspiracy. ROA.10-20. Law enforcement arrested Navarrete on the complaint the following day. ROA.28. The government then indicted Navarrete, Mejia Cano, and Jason Xavier Villanueva for conspiring to distribute 40 grams or more of a mixture or substance containing fentanyl. ROA.29-34.[1] The government later named five more defendants in the conspiracy count, including Rafael Soliz, Jr., a.k.a. "Rafi" and "Junior," and Robert Alexander Gaitan. ROA.38-39. According to the superseding indictment, Navarrete, Soliz, Gaitan, and other coconspirators participated in the distribution of fentanyl in the form of counterfeit "M30" pills. ROA.39. The superseding indictment also named Navarrete

---

[1] Navarrete was not named in the indictment's second count, which charged Villanueva with violating 18 U.S.C. § 924(c)(1)(A)(i). ROA.31.

in an additional count, i.e. Count Four, which charged him with know-ingly distributing fentanyl to a person under twenty-one years of age on or about January 13, 2023. ROA.42.[2]

Navarrete pleaded guilty to both counts without a plea agreement. ROA.38-39, 42, 112, 280. In the presentence investigation report ("PSR"), the probation officer described Navarrete's role in the conspiracy "as a distributor of counterfeit M30 pills" who "distributed primarily to juve-nile dealers since at least August 2022, mostly from his residence…." ROA.266. The officer described Soliz "as a distributor of counterfeit M30 pills" too. ROA.266. Soliz, the officer detailed, "distributed counterfeit M30 pills primarily to juvenile dealers and users, including Juvenile Overdose Victim (JODV) 2, who died." ROA.266. Julio Gonzales, Jr. was identified as a supplier for both Navarrete and Soliz, and the officer iden-tified Villanueva as an additional source of supply for Soliz. ROA.266. Navarrete and Soliz were also connected to Gaitan, who "transported counterfeit M30 pills for Navarrete and Soliz." ROA.266. The probation officer reported that "Soliz and Navarrete often worked together" without

---

[2] Navarrete was not named in the superseding indictment's remaining six counts. ROA.40-41, 43-46.

further explanation at first. But later, the officer described how "Navarrete relied on Gaitan, Soliz, and others to pick up quantities of counterfeit M30 pills from SOSs and deliver the pills to Navarrete's residence" from late December 2022 to February 2023, when Navarrete was on home confinement as a condition of a state criminal bond. ROA.267.

On January 12, 2023, law enforcement observed Navarrete conduct a hand-to-hand transaction with someone identified only as Juvenile Dealer 6, confirming later the distribution of fentanyl by reviewing Juvenile Dealer 6's phone. ROA.267. The probation officer also detailed a drug transaction involving 1 gram of fentanyl completed by Cano at Navarrete's request, another hand-to hand transaction by Navarrete which resulted in the discovery of .2 grams of fentanyl, and a controlled buy of multiple counterfeit M30 pills. ROA.267-68. Following Navarrete's federal arrest, law enforcement executed a search warrant at his residence and also found 29 counterfeit M30 pills containing 2.9 grams of fentanyl. ROA.268. "[S]ubsequent investigation into the conspiracy" revealed "that Navarrete was responsible for distributing/receiving at least 1,000 counterfeit M30 pills containing 100 grams of Fentanyl...." ROA.268. In the

end, the probation officer adjudged Navarrete responsible for 104.1 grams of fentanyl. ROA.268.

To calculate the offense level, the probation officer first grouped Counts One and Four together under USSG[3] §3D1.2. ROA.269. The officer then calculated Navarrete's offense level by applying USSG §2D1.2, the guideline applicable for Count Four, because §2D1.2 produced the highest guideline range. ROA.270. After an adjustment for acceptance of responsibility, the officer calculated a total offense level of 23. ROA.270. As for criminal history, Navarrete only had one prior 16-day sentence, although the PSR listed four pending state charges. ROA.271-74. The officer accordingly calculated a criminal history category ("CHC") of I, which combined with total offense level of 23 produced a guideline range of 46 to 57 months. ROA.272, 279. Because Count One carried a mandatory minimum punishment of five years, the probation officer adjusted the range to 60 months. ROA.279-80. The officer identified USSG §2K2.0 and USSG §4A1.3(a)(2)(D) as potential grounds for departure, opining

---

[3] "USSG" refers to the U.S. SENT'G COMM'N, GUIDELINES MANUAL (Nov. 2023), which the probation officer applied to Navarrete's offenses. ROA.269.

that the guidelines did not adequately factor in the dangerousness of the fentanyl that Navarrete sold while on bond. ROA.281-82.

Neither party disputed the guideline range. ROA.285-88.[4] But the government moved for a substantial upward departure from 60 to 240 months, citing USSG §5K2.1 and §5K2.2. ROA.323-38. In its written motion, the government detailed the overdose deaths of three persons: V.D., J.P., and A.Z. ROA.326-27, 329-30, 333-36. The government recounted how, after Navarrete's state arrest in October 2022 and during Navarrete's incarceration, Soliz sold fentanyl to V.D. after V.D. contacted Soliz for drugs in late November 2022, culminating in V.D.'s fatal overdose on December 11, 2022. ROA.326-27. The government also highlighted that Navarrete participated in the chain of distribution of the M30 pills that J.P. and A.Z. used, and that Navarrete continued with his offense despite learning of their deaths. ROA.333-36. The government faulted Navarrete

---

[4] The government later requested the probation officer to amend the PSR to identify J.P. as a victim eligible for restitution and include his mother's restitution request for $32,574.00. ROA.339-43. Probation amended the PSR to include J.P.'s mother's victim impact statement. ROA.290-96. Navarrete objected to any restitution award on the grounds of his indigency, unwarranted sentencing disparities, and the nature of the costs underpinning the request. ROA.297-99. The district court deferred the restitution question at sentencing. ROA.120-21, 220. At a later hearing, the court awarded $15,000 in restitution to J.P.'s mother, owed joint and severally by Navarrete and Gonzales, Jr. ROA.224-43.

for failing to cooperate with law enforcement and for committing the offense while on bond too. ROA.331, 336-37.

Navarrete submitted a response to the government and his own sentencing memorandum. ROA.344-83. In his response, Navarrete acknowledged that he participated in the chain of drug distribution that ultimately led to J.P.'s and A.Z.'s deaths, and he accepted that his conduct merited an upward variance. ROA.346, 348. He disputed, however, that V.D.'s death fell within the scope of his jointly undertaken criminal activity (and was in furtherance of that activity). ROA.347-48. In his sentencing memorandum, Navarrete presented his limited intellectual functioning, childhood trauma, personal addiction to fentanyl, and remorse as mitigation. ROA.350-59. Navarrete also submitted an expert report by Dr. Daniel Martell, a forensic neuropsychologist, detailing Navarrete's diagnoses of mild intellectual disability and moderate opioid use disorder. ROA.360-83. In the end, Navarrete requested a sentence of ten years, double the guideline range. ROA.348, 350.

At sentencing, the district court started with the guideline range. ROA.120. It then acknowledged the government's request for an upward departure to 240 months, and the defense's request for 120 months.

8

ROA.120-21. The court first heard Dr. Martell's expert testimony and Navarrete's argument. ROA.122-57. Navarrete continued to advocate for a ten-year sentence. ROA.122, 154, 157.

The district court then heard testimony from DEA Task Force Officer ("TFO") Bert Ingram, J.P.'s mother's statement, and the government's argument. ROA.157-213. TFO Ingram testified on the details of the conspiracy, the overdose deaths, and Navarrete's proffer opportunity. ROA.158-204. According to TFO Ingram, Navarrete occupied a higher position within the conspiracy's hierarchy than Soliz, supplied Soliz with drugs at least once, and relied on Soliz "to maintain the network and keep it established while" Navarrete was in state custody after his October 2022 arrest. ROA.159-60, 165-66, 252. TFO Ingram elaborated on this last point on cross-examination, explaining that Soliz recorded a video while visiting Navarrete (who was in custody) in which Soliz stated to Navarrete that Soliz would "hold it down." ROA.195-96. TFO Ingram admitted, however, that he had no evidence that Navarrete funded Soliz while incarcerated, and that Soliz had his own customers. ROA.196, 198.

Over Navarrete's objection, the government also elicited testimony from TFO Ingram on V.D.'s death and submitted three personal photographs of V.D. — in a cheerleading outfit, on her birthday, and at a Cowboys game — as exhibits. ROA.169-72, 244-46. The government further noted that V.D.'s mother was present at sentencing. ROA.192. TFO Ingram confirmed what the government had already submitted in its written motion: that Navarrete was incarcerated at the time of V.D.'s death, and that Soliz — not Navarrete — had provided V.D. with the pill that caused her death. ROA.160, 169-72. TFO Ingram further confirmed that Navarrete was not present during V.D.'s death, and that Soliz did not obtain, nor needed, approval from Navarrete for the sale. ROA.198.

The government also elicited testimony on the deaths of J.P. and A.Z. ROA.177-88.[5] As with V.D., the government presented personal photographs of J.P. as exhibits, including one of J.P. in a football uniform. ROA.177-79, 247-50. J.P.'s mother was present in the courtroom and spoke during the sentencing. ROA.205-09. Consistent with the government's written motion and Navarrete's previous concession, TFO Ingram

---

[5] In the sentencing transcript, A.Z. appears as "Ollie Xander" instead of Alizander, which counsel understands from case information would be the correct transcription.

testified that Navarrete supplied a dealer known as A.F., who then sold the drugs to J.P. ROA.179. TFO Ingram further testified that on the morning of J.P.'s death, A.F. notified Navarrete about what happened. ROA.179-82, 253-56. Finally, TFO Ingram testified about A.Z.'s overdose. ROA.183-88. Unlike the personal photographs submitted of V.D. and J.P., the government only submitted a law enforcement surveillance photograph of A.Z. with A.Z.'s back to the camera. ROA.184, 259. As with J.P., A.F. obtained the pills he distributed to A.Z. from Navarrete, and Navarete was notified of A.Z.'s death. ROA.185-88, 257-58.

Navarrete responded that the court should not punish him for his failed proffer. ROA.215. But Navarrete acknowledged the need of an upward departure to account for the deaths that had resulted from his offense. ROA.214-15. Navarrete again urged the court to sentence him to ten years — double the guideline range — to account for those deaths, which the court must balance Navarrete's mental impairments and how his conduct compared to his codefendants. ROA.214-16.

The district court went further and imposed a sentence *four times* the guideline range. ROA.219. To justify such a punitive sentence, the court first noted that both sides agreed that Navarrete's case was "an example"

of the guidelines not "get[ting] it right…" ROA.217. "I want to say that this sentence today, when you look at there are two deaths and the physical injuries to all of these children in this case, the sentence I'm going to impose is certainly appropriate for that." ROA.217. The district court also addressed V.D.'s and J.P.'s mothers directly:

> I want to speak to you two mothers that are here today. I cannot imagine the pain…I look at that -- you know, that football uniform and that cheerleader uniform and it -- it just happens to get stuck in my face every week from my grandchildren, one of whom played football all day Sunday, and I was there, and my granddaughter who is a cheerleader, and reminds me every day of y'all, the two of y'all. I won't forget it. I promise you. I won't forget y'all, and your sweetness to be forgiving. You know, I like to claim because I'm a Christian I can be forgiving but I'm not certain – the Lord would have to beat me over the head to get to the point where you two ladies are.

ROA.218. Further, the court noted that Navarrete was not similarly situated to his codefendants because of Navarrete's failure to cooperate. ROA.217. And "you did have a terrible upbringing, as do nearly 90 percent of the people that I deal with in here," the court stated, "so I get that." ROA.219. But it concluded: "[Y]our activity…I don't know a right word to say. I mean, it's horrendous, horrible, terrible." ROA.219.

Ultimately, the district court acceded to the government's request and sentenced Navarrete to 240 months. ROA.219. In its statement of reasons, the court identified the guidelines as 60 months and classified its sentence as a USSG §5K2.1 upward departure granted on the government's motion. ROA.300-01. The court made no determination on a variance. ROA.302. "In determining a sentence," the court concluded, the court considered "the advisory guidelines…as well as statutory concerns listed in 18 USC Section 3553(a)."

Navarrete timely appealed. ROA.95.

## SUMMARY OF THE ARGUMENT

The district court reversibly erred because it improperly punished Navarrete for causing V.D.'s death. First, Navarrete's conduct was not a but-for cause of V.D.'s overdose death. Second, Navarrete's conduct was otherwise too remote and attenuated from V.D.'s death for the court to punish Navarrete for the death. And third, *even if* V.D.'s death could properly factor into the court's sentencing calculus, the court still erred because it punished Navarrete for J.P.'s and V.D.'s deaths equally, when Navarrete's criminal conduct with regards to each was demonstrably different. For these reasons, the court abused its discretion and imposed a substantively unreasonable sentence.

# ARGUMENT

## I.   Standard of review: This Court will determine if the district court abused its discretion.

Navarrete requested a 120-month sentence, but the district court doubled it and sentenced him to 240 months, *four times* the guideline range. ROA.122, 154, 157, 219, 300, 348, 350. By requesting ten versus twenty years, Navarrete preserved for appellate review the substantive reasonableness of his sentence. *Holguin-Hernandez v. United States*, 589 U.S. 169, 173–74 (2020).

"We review a preserved objection to a sentence's substantive reasonableness for an abuse of discretion, examining the totality of the circumstances." *United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013). "'[T]he Guidelines should be the starting point and the initial benchmark' for sentencing." *United States v. Bostic*, 970 F.3d 607, 610 (5th Cir. 2020) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The court abuses its discretion when it sentences above the guideline range and the sentence "'(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors,'" *United States v. Mathes*, 839 F. App'x 879, 881–82 (5th Cir.

2021) (quoting *United States v. Gerezano-Rosales*, 692 F.3d 393, 400–01 (5th Cir. 2012)).

A sentence above the guideline range enjoys no presumption of reasonableness on appeal. *United States v. Hoffman*, 901 F.3d 523, 554–55 (5th Cir. 2018). And the "degree of the variance" from the guidelines, albeit "not dispositive," informs the analysis. *Id.* at 882. "The farther a sentence varies from the applicable Guideline sentence, the more compelling the justification based on factors in section 3553(a) must be." *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006) (internal quotation marks omitted). "A significant variation must be supported by a significant justification—'a major departure should be supported by a more significant justification than a minor one.'" *Mathes*, 839 F. App'x at 882 (quoting *Gall*, 552 U.S. at 50).

## II.   Point of error: The district court improperly punished Navarrete for causing V.D.'s death.

In its written motion before sentencing, the government urged a §5K2.1 upward departure to 240 months by pointing to the overdose deaths of three people: V.D., J.P., and A.Z. ROA.326-27, 329-30, 332-36. Navarrete disputed in his written response that V.D.'s death fell within

16

the scope of his offense because Soliz acted independently when Soliz distributed to V.D. ROA.347-48.

At sentencing, the government elicited testimony from TFO Ingram — over Navarrete's objection — about all three people, including V.D. ROA.158, 169-72, 177-88. Again, over Navarrete's objection, the government also presented personal photographs of V.D. and J.P. as exhibits. ROA.170-71, 244-50. These included a photograph of V.D. in a cheerleading outfit, and one of J.P. in a football uniform. ROA.244, 247. The government further demonstrated that someone personally notified Navarrete of J.P.'s death. ROA.179-82, 253-56. And the government noted that V.D.'s mother was present at the sentencing and invited J.P.'s mother to make a victim impact statement. ROA.192, 204-09.

The government's presentation at sentencing for A.Z., however, was more muted. Unlike the deeply personal photographs of V.D. and J.P., the government presented only a law enforcement surveillance photograph where A.Z.'s back was to the camera. ROA.183, 259. The government did point out that someone also personally notified Navarrete of this death. ROA.185-88, 257-58.

The court granted the §5K2.1 upward departure and imposed a 240-month sentence as the government requested. ROA.219, 301. Despite the government presenting evidence of three deaths, only "two deaths" stuck in the court's mind. ROA.217. To the "two mothers that are here today," the court stated:

> I look at that -- you know, that football uniform and that cheerleader uniform and it -- it just happens to get stuck in my face every week from my grandchildren, one of whom played football all day Sunday, and I was there, and my granddaughter who is a cheerleader, and reminds me every day of y'all, the two of y'all. I won't forget it. I promise you.

ROA.218. The court concluded that despite Navarrete's mitigation, his criminal conduct was "horrendous, horrible, terrible." ROA.219.

The court's justification at sentencing makes clear that V.D.'s and J.P.'s deaths featured heavily in the court's decision to *quadruple* the guideline range. The court zeroed in on those two deaths, especially because the deaths reminded the sentencing judge of his own grandchildren. True enough, "nothing prevents a sentencing court from considering the fact that death resulted from an offense." *United States v. Hudgens*, 4 F.4th 352, 358 (5th Cir. 2021). But "[t]here is a distinction…between" "considering [the defendant's] behavior in the face of [the victim's]

18

fatal intoxication and under the totality of the circumstances" and "improperly punishing [a defendant] for causing [a victim's] death[.]" *Id.* at 360. Here, the district court weighed the deaths of V.D. and J.P. equally to a reach a sentence 400% of the guidelines. But unlike with J.P., Navarrete played no role in V.D.'s death.

In considering V.D.'s death and further failing to differentiate Navarrete's conduct vis-à-vis V.D. and J.P., the court erred. Section 841(a) and (b)(1)(B), which Navarrete pleaded guilty to conspiring to violate, provides for a sentencing enhancement when "death or serious bodily injury *results from* the use of such substance." 21 U.S.C. § 841(b)(1)(B) (emphasis added); ROA.38-39, 73, 112. A death "results from" a § 841(a) and (b)(1)(B) offense when "use of the drug distributed by the defendant" "is a but-for cause of the death or injury," *Burrage v. United States*, 571 U.S. 204, 218–19 (2014); *see also id.* at 210–14, 216 (interpreting the "results from" statutory language as imposing a requirement of but-for causation). Parallel to § 841, USSG §5K2.1 likewise applies only when "death resulted" from the offense. *Burrage*'s statutory interpretation makes clear that like the death enhancement in 21 U.S.C. § 841, upward depar-

tures under §5K2.1 may rest only on deaths caused but for the defendant's offense. *Cf. United States v. Greenough*, 669 F.3d 567, 574–75 (5th Cir. 2012) ("Our interpretation of the Sentencing Guidelines is subject to the ordinary rules of statutory construction," and USSG §2D1.1's enhanced base offense level for when "death…resulted" applies only when the crime of conviction also includes the death). The government established this with J.P.'s death. ROA.179; *United States v. Thompson*, 945 F.3d 340, 345 (5th Cir. 2019). But the record demonstrates the opposite with respect to V.D.

Navarrete pleaded guilty to participating in a fentanyl drug conspiracy and distributing fentanyl to a minor on or about January 13, 2023. ROA.38-39, 42, 73, 122. The distribution count did not involve V.D. *See* ROA.267. As for the conspiracy count, the probation officer reported that Navarrete "was identified as a distributor of counterfeit M30 pills" who "distributed primarily to juvenile dealers since at least August 2022, mostly from his residence…." ROA.266. The officer further identified Navarrete's source of supply as Julio Gonzales, Jr. ROA.266.

Like Navarrete, Soliz was also "a distributor of counterfeit M30 pills supplied by Gonzales." ROA.264, 266. Soliz benefitted, however, from Villanueva as an additional supplier. ROA.266. "Soliz distributed counterfeit M30 pills primarily to juvenile dealers and users, including Juvenile Overdose Victim (JODV) 2, who died." ROA.266. V.D.'s death was discovered on December 11, 2022. ROA.169, 327. And from October 2022 until after V.D.'s death, Navarrete was in state custody. ROA.160, 170, ROA.267, 325, 327. Further, no one disputes that (1) Soliz and Navarrete had independent customers, (2) V.D. was Soliz's customer, and (3) Soliz sold the fentanyl to V.D. ROA.169-72, 198, 326–27. The government found no evidence that Navarrete funded Soliz during Navarrete's incarceration, and it admitted that Navarrete's approval was not needed for the sale. ROA.196, 198. Indeed (and again in contrast to the circumstances surrounding J.P.'s death), no record evidence exists that Navarrete was even *aware* of the sale or V.D.'s death. *Cf.* ROA.254-54.

"An act is a but-for cause of cause of an event if the act is a sine qua non of the event—if, in other words, the absence of the act would result in the non-occurrence of the event." *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011). "Conversely, an act is *not* a but-for cause of an event if the

event would have occurred even in the absence of the act." *Id.* (emphasis added). V.D.'s death resulted from Soliz's independent illicit drug distribution — Soliz had his own connection to the source, his own customers, and his own money. The record establishes that Navarrete's offense was not a but-for cause of V.D.'s death. Tragically, V.D.'s death would have occurred irrespective of Navarrete's criminal conduct.

Even so, the government sought to hold Navarrete responsible because Soliz and Navarrete distributed drugs from the same source. ROA.198-99. Soliz and Navarrete were friends and knew each other since middle school or early high school. ROA.164, 202. According to the probation officer, "Soliz and Navarrete often worked together." ROA.266. In particular, the officer reported that Navarrete relied on Soliz for drug deliveries while Navarrete was on house arrest as a condition of a state bond. ROA.267. This collaboration, however, occurred *after* V.D.'s death. ROA.165-66, 197-98, 252, 267.

At sentencing, TFO Ingram also testified that Soliz committed to Navarrete that Soliz would "hold it down" while Navarrete was incarcerated. ROA.196. From that isolated statement, the government apparently concluded that Soliz's role "was to maintain the network and keep

it established while the defendant was in jail." ROA.166. But again —
even if Soliz assisted with maintaining his friend Navarrete's drug dis-
tribution ring, that assistance does not automatically saddle Navarrete
with the burdens of Soliz's own pre-existing and independent illicit drug
business. Soliz's "hold it down" statement perhaps may suffice for the
district court to conclude that Navarrete leaned on Soliz to keep the drugs
flowing from Navarrete's suppliers to Navarrete's customers. But Navar-
rate's reliance on Soliz during that time is far too remote from Soliz's
independent sale to V.D. and V.D.'s death for the court to punish Navar-
rete for Soliz's criminal conduct.

The court then compounded the error by assigning equal weight to
both V.D.'s and J.P.'s death. Of course, V.D.'s life and J.P.'s life are
equally valuable. The court's sentence, however, must consider Navar-
rete's "conduct," 18 U.S.C. § 3661, and reflect the "nature and circum-
stances of" Navarrete's "offense," 18 U.S.C. § 3553(a)(1). Simply put, Na-
varrete's criminal conduct vis-à-vis the circumstances surrounding the
deaths of V.D. and J.P. is *not* the same, and Navarrete's sentence should
reflect that difference. Yet the court's stated justification placed
Navarrette's conduct as it relates to V.D.'s death and Navarrete's conduct

23

as it relates to J.P.'s death on the same plane in terms of culpability. *See* ROA.217–18. This was error. If the remoteness of Navarrete's conduct from the circumstances that resulted in V.D.'s death does not remove V.D.'s death from the sentencing calculus entirely, then surely the tenuous connection between Navarrete's offense and V.D.'s death strongly differentiates V.D.'s death from the death of J.P. And the court's sentence should reflect the difference. Instead, the court improperly sentenced Navarrete for causing *both* deaths. In doing so, the court abused its discretion and imposed a substantively unreasonable sentence.

## CONCLUSION

Because the district court imposed a substantively unreasonable sentence that improperly punished Navarrete for V.D.'s death, Navarrete asks this Court to vacate his sentence and remand for resentencing.

Respectfully submitted,

JASON D. HAWKINS
Federal Public Defender
Northern District of Texas

*s/ Maria Gabriela Vega*
**M. GABRIELA VEGA**
Assistant Federal Public Defender
Texas Bar No. 24084014
525 Griffin St., Ste. 629
Dallas, Texas 75202
Phone 214.767.2746
Fax 214.767.2776
gabriela_vega@fd.org

## CERTIFICATE OF SERVICE

I certify that on November 14, 2024, I filed this brief electronically in the Court's ECF system. Opposing counsel has therefore been served under Fifth Circuit Rule 25.2.5. I also certify that: 1) any required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper document; and 3) this document has been scanned for viruses by Trend Micro Security Agent, a commercial virus scanning program, and it is free of viruses.

*s/ Maria Gabriela Vega*

M. GABRIELA VEGA

## CERTIFICATE OF COMPLIANCE

Under Rule 32(a)(7) of the Federal Rules of Appellate Procedure, I certify this brief complies with the length limitation announced in Rule 32(a)(7)(B), because it contains 4278 words.

This brief complies with the typeface and type style requirements because it has been prepared in Microsoft Word using the proportionally spaced typeface Century Schoolbook, in a 14-point font size in the body of the brief, and a 12-point font size in the footnotes.

I understand that a material misrepresentation in completing this certificate, or circumvention of the length limitations in Federal Rule of Appellate Procedure 32(a)(7), may result in the Court striking the brief and imposing sanctions.

*s/ Maria Gabriela Vega*
M. GABRIELA VEGA
