# 24-10583

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**UNITED STATES OF AMERICA,**
Plaintiff-Appellee

v.

**LUIS EDUARDO NAVARRETE,**
Defendant-Appellant

On Appeal from the United States District Court
For the Northern District of Texas
Dallas Division
District Court No. 3:23-CR-067-K-1

**APPELLEE'S BRIEF**

Leigha Simonton
United States Attorney

Daniel Z. Gordon
Assistant United States Attorney
D.C. Bar No. 1736506
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: (214) 659-8794
daniel.gordon@usdoj.gov

Attorneys for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. Navarrete presents a straightforward challenge to the substantive reasonableness of his upwardly varied 240-month sentence. This Court can easily determine on the briefs, the record, and relevant authority that the district court did not abuse its discretion.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ..................................... i

TABLE OF AUTHORITIES ......................................................... iv

STATEMENT OF JURISDICTION ............................................... 1

STATEMENT OF THE ISSUE ................................................... 1

STATEMENT OF THE CASE ................................................... 1

    1.    Navarrete conspires to sell counterfeit M30 pills laced with fentanyl to juvenile drug dealers who, in turn, resell the pills to middle- and high-school-aged children ......................................... 1

    2.    After Navarrete learns that counterfeit M30 pills he sold caused the deaths of two teenagers—J.P. and A.Z.—within a one-week span, he continues distributing deadly pills to minors .................. 3

    3.    Navarrete pleads guilty to conspiracy to distribute a controlled substance and distribution of a controlled substance to a minor, the PSR calculates a guidelines range of 60 months, and the government moves for an upward departure based on the deaths of J.P. and A.Z ................................................................ 4

    4.    After hearing the parties' arguments, Navarrete's allocution, witness testimony, and a victim-impact statement from J.P.'s mother, the court upwardly varies and sentences Navarrete to 240 months ................................................................ 7

SUMMARY OF THE ARGUMENT ......................................... 10

ARGUMENT AND AUTHORITIES ......................................... 12

    Navarrete's 240-month sentence is substantively reasonable ................ 12

A.    The best reading of the record is that the court upwardly varied and properly considered all facets of the case under the Section 3553(a) factors ............................................................................. 15

B.    Even if the court upwardly departed under USSG § 5K2.1, it did so by granting the government's motion, which did not rely on V.D.'s death ................................................................................ 19

      i.    Any error in departing under USSG § 5K2.1 is harmless... 22

C.    This Court should reject Navarrete's invitation for it to reweigh the Section 3553(a) factors ........................................................ 22

CONCLUSION .......................................................................................... 24

CERTIFICATE OF COMPLIANCE ........................................................... 25

# TABLE OF AUTHORITIES

**Federal Cases**                                                          **Page(s)**

*Gall v. United States*, 552 U.S. 38 (2007) ....................................................13, 14

*Holguin-Hernandez v. United States*, 589 U.S. 169 (2020) .................................. 12

*United States v. Barnett*, 2020 WL 7062603 (S.D. Ohio Oct. 9, 2020) ................ 5

*United States v. Bryson*, 838 F. App'x 64 (5th Cir. 2020) ................................. 22

*United States v. Cortez-Balderas*, 74 F.4th 786 (5th Cir. 2023)........................... 12

*United States v. De Los Santos*, 668 F. App'x 98 (5th Cir. 2016) ....................... 15

*United States v. Diehl*, 775 F.3d 714 (5th Cir. 2015) ........................................ 13

*United States v. Hudgens*, 4 F.4th 352 (5th Cir. 2021) .................................16, 17

*United States v. Martin*, 119 F.4th 410 (5th Cir. 2024)..................................... 16

*United States v. Nguyen*, 854 F.3d 276 (5th Cir. 2017)..................................... 13

*United States v. Oladimeji Seun Ayelotan,* 917 F.3d 394 (5th Cir. 2019) ............. 24

*United States v. Rider*, 94 F.4th 445 (5th Cir. 2024)....................................17, 18

*United States v. Rodriguez*, 15 F.3d 408 (5th Cir. 1994).................................... 12

*United States v. Roy*, 88 F.4th 525 (4th Cir. 2023)........................................... 18

*United States v. Smith*, 203 F.3d 884 (5th Cir. 2000) ....................................... 17

*United States v. Smith*, 440 F.3d 704 (5th Cir. 2006) ....................................... 17

*United States v. Warren*, 720 F.3d 321 (5th Cir. 2013) ..................................... 14

**Federal Statutes and Rules**                                    **Page(s)**

18 U.S.C. § 3231 ............................................................................1

18 U.S.C. § 3742(a) .......................................................................1

Fed. R. App. P. 4(b) ......................................................................1

**Federal Sentencing Guidelines**

USSG § 5K2.1......................................................................... *passim*

**Other Authorities**

United States Drug Enforcement Administration, *More Than Three Million Lethal Doses of Fentanyl Seized in Minnesota Last Year*, https://www.dea.gov/press-releases/2021/03/18/more-three-million-lethal-doses-fentanyl-seized-minnesota-last-year (last visited Dec. 17, 2024)............5

United States Drug Enforcement Administration, *Fentanyl*, https://www.dea.gov/factsheets/fentanyl (last visited Dec. 17, 2024).........18

## STATEMENT OF JURISDICTION

This is a direct appeal from a sentence in a criminal case.  The district

court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction

under 18 U.S.C. § 3742(a).  The district court entered its written judgment on

June 26, 2024, (ROA.88-94), and Navarrete timely filed the notice of appeal on

June 27, 2024, (ROA.95).  Fed. R. App. P. 4(b).

## STATEMENT OF THE ISSUE

Was Navarrete's 240-month sentence substantively unreasonable where

the district court upwardly varied based on Navarrete's egregious conduct

including distributing counterfeit M30 pills laced with fentanyl to minors,

causing the deaths of two minors, and continuing to sell those pills to minors

after learning of their deaths?

## STATEMENT OF THE CASE

1.   **Navarrete conspires to sell counterfeit M30 pills laced with fentanyl to
     juvenile drug dealers who, in turn, resell the pills to middle- and high-
     school-aged children.**

Beginning in August 2022, Navarrete—as part of a larger drug

conspiracy—sold counterfeit M30 pills laced with fentanyl to eight juvenile

dealers.[1]  (ROA.160-61, 164, 265-67.)  Those dealers, in turn, resold the pills to

minors attending R.L. Turner High School, Chester W. Nimitz High School,

_____

[1] The pills were sourced from an affiliate with the Sinaloa cartel in Mexico.  (ROA.163.)

Dewitt Perry Middle School, and Dan F. Long Middle School in Carrollton, Texas. (ROA.164, 265.) Navarrete sold the drugs out of his home which was about a block and a half from R.L. Turner High School and Dewitt Perry Middle School. (ROA.164-65.)

In October 2022, Navarrete was arrested on domestic violence assault charges. (ROA.166, 172.) While Navarrete was in custody, another member of the conspiracy, his close friend Rafael Soliz, Jr.—who was lower than Navarrete in the drug conspiracy hierarchy[2]—agreed to "hold down" the drug distribution operation by selling counterfeit M30 pills. (ROA.160, 164, 196.) Soliz obtained pills from the same source of supply he had been introduced to by Navarrete and sold them to the same juvenile dealers. (ROA.164-68.) During that period, Soliz sold those pills to V.D., a 13- or 14-year-old Dewitt Perry Middle Schooler, who died as a result from fentanyl poising. (ROA.169-70.)

Shortly after V.D.'s death, Navarrete was released from jail to home confinement and "[a]lmost immediately" returned to selling counterfeit M30 pills containing fentanyl to minors. (ROA.172.) Because he was on home

---

[2] Navarrete was the leader of the south Carrollton network of the conspiracy overseeing Soliz and Alexander Gaitan, both drug distributors, and directing the amount of drugs picked up from the source. (ROA.174, 198.)

confinement, Navarrete relied on others, including Soliz, to pick up the M30s

from his source of supply and deliver them to his residence.  (ROA.172, 198.)

**2.**   **After Navarrete learns that counterfeit M30 pills he sold caused the deaths of two teenagers—J.P. and A.Z.—within a one-week span, he continues distributing deadly pills to minors.**

In January 2023, two teenagers died within a week of each other due to

counterfeit M30 pills sold by Navarrete.  First, J.P., a 14-year-old eighth grader

at Dan F. Long Middle School, died of a fentanyl overdose after purchasing

M30 pills from a juvenile dealer who procured the pills from Navarrete.

(ROA.178-79.)  On the morning of J.P.'s death, the juvenile dealer messaged

Navarrete on Instagram that J.P. died after ingesting the M30 pills that

Navarrete had sold him.  (ROA.179-81.)  The juvenile dealer also sent

Navarrete a picture of first responders unsuccessfully attempting to resuscitate

J.P.  (ROA.182.)

A week after J.P.'s death, another minor, A.Z.,[3] a 17-year-old student at

R.L. Turner High School, died of an overdose after purchasing drugs from a

juvenile dealer who procured them from Navarrete.  (ROA.183-85.)  On the

morning of A.Z.'s death, the juvenile dealer texted Navarrete that A.Z. had

overdosed and died, to which Navarrete responded that he had not sold the

---

[3] The parties agree that the sentencing transcript incorrectly references the minor as O.X., instead of A.Z.  (*See* Brief at 10 n.5.)

drugs to A.Z., but rather had sold them to a different juvenile dealer—the same dealer that sold the pills to A.Z. (ROA.185-88.) Despite becoming aware that over a one-week period, two juveniles had overdosed and died after ingesting counterfeit M30 pills that he was distributing, Navarrete continued selling the deadly pills to minors. (ROA.188.) Navarrete was then arrested. (ROA.189.)

3. **Navarrete pleads guilty to conspiracy to distribute a controlled substance and distribution of a controlled substance to a minor, the PSR calculates a guidelines range of 60 months, and the government moves for an upward departure based on the deaths of J.P. and A.Z.**

Navarrete and his codefendants were charged in an eight-count superseding indictment, in which Navarrete was charged with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a) and (b)(1)(B) and 846 (Count One) and distribution of a controlled substance to a person under 21 years of age in violation of 21 U.S.C. § 859 (Count Four). (ROA.38-48.) Navarrete pled guilty to those counts without a plea agreement. (ROA.79, 280.)

The PSR calculated Navarrete's advisory-guideline range to be 46 to 57 months' imprisonment based on his total offense level of 23 and criminal-history category of I, which was then adjusted to 60 months based on Count One's statutory mandatory minimum. (ROA.279.) Navarrete was held responsible for distributing or receiving "at least 1,000 counterfeit M30 pills

containing 100 grams of [f]entanyl," and a total of 104.1 grams of fentanyl.[4] (ROA.268.)

The PSR also provided two bases for the court to upwardly vary or depart. (ROA.281-82.) First, it noted that Navarrete's guidelines did "not take into account the dangerousness of the counterfeit M30 pills containing [f]entanyl sold by [Navarrete] and his codefendants which caused the overdoses and deaths of multiple juvenile victims." (ROA.281.) Second, it referenced Navarrete "running his drug distribution business and taking part in this narcotics trafficking conspiracy" while "he was on bond for four separate pending state charges out of Dallas County, Texas." (ROA.281.) Moreover, the PSR stated that Navarrete was "not deterred from distributing counterfeit M30 pills containing [f]entanyl to juvenile dealers and users" even while on house arrest as a condition of his bond. (ROA.281-82.)

Recognizing that 60 months did not properly account for Navarrete's serious criminal conduct in this case, the government and Navarrete both asked for higher sentences—Navarrete requested a 120-month sentence,

---

[4] For context, "[a] lethal dose of fentanyl consists of two milligrams, equal in size to a few grains of salt." *See* United States Drug Enforcement Administration, *More Than Three Million Lethal Doses of Fentanyl Seized in Minnesota Last Year*, https://www.dea.gov/press-releases/2021/03/18/more-three-million-lethal-doses-fentanyl-seized-minnesota-last-year (last visited Dec. 17, 2024). "Doing the math, 100 grams of fentanyl contains 50,000 lethal doses." *United States v. Barnett*, No. 1:19-CR-50-MWM-1, 2020 WL 7062603, at *1 (S.D. Ohio Oct. 9, 2020).

(ROA.350), and the government requested a 240-month sentence, (ROA.337).

The government filed a sentencing memorandum and motion for upward

departure asking the court to depart under USSG §§ 5K2.1 and 5K2.2, given

Navarrete distributed counterfeit M30 pills that caused the deaths of two

minors, J.P. and A.Z., and led to other minors overdosing.  (ROA.332-37.)

While the government's departure motion also described V.D.'s death due to

counterfeit M30 pills she received from Soliz as conduct of the conspiracy,

(ROA.326-27), V.D.'s death was not listed as a basis for the court to upwardly

depart under USSG §§ 5K2.1 and 5K2.2, (ROA.331-37).  Finally, the

government's sentencing memorandum detailed six nonfatal overdoses of

minors traced to Navarrete's and his coconspirators' drug distribution.

(ROA.325-30.)  Many of those minors required naloxone (NARCAN) and

hospitalization as a result, with one minor "on a ventilator in intensive care for

several days" and another minor remaining in "intensive care on a ventilator

partially paralyzed for several days."  (ROA.325-30.)

    In his response to the government's sentencing memorandum, Navarrete

objected to the court considering V.D.'s fatal overdose and two other minors'

nonfatal overdoses as "relevant conduct" under the guidelines because

Navarrete was in custody at the time of their overdoses, and he did not

distribute the drugs that caused their overdoses.[5] (ROA.346-48.) And in addressing the government's request for a departure under USSG § 5K2.1, Navarrete argued that the government's request of 240 months was too high, noting that he did not "directly distribute fentanyl to any victims that died, when others did (i.e., Soliz)." (ROA.348.)

**4. After hearing the parties' arguments, Navarrete's allocution, witness testimony, and a victim-impact statement from J.P.'s mother, the court upwardly varies and sentences Navarrete to 240 months.**

At the sentencing hearing, Navarrete called forensic neuropsychologist Dr. Daniel Martell who testified about Navarrete's mild intellectual disability and background. (ROA.123-149.) That was followed by Navarrete's brief allocution. (ROA.157.)

Then, the government called DEA Task Force Officer Bert Ingram who testified about Navarrete's role in the drug conspiracy. (ROA.158-203.) Over Navarrete's objection that such testimony did not qualify as "relevant conduct" under the guidelines, TFO Ingram testified about V.D.'s death caused by counterfeit M30 pills provided to her by Soliz. (ROA.168-71, 175.) The government also introduced three photographs of V.D., including one in her cheerleader uniform, (*see, e.g.*, ROA.171, 244), and noted that V.D.'s mother

---

[5] Navarrete acknowledged that one of the minors experienced a second nonfatal overdose after he was released from custody, but nonetheless argued that he did not distribute the fentanyl that caused that second overdose. (ROA.347.)

was present in the courtroom, (ROA.192). TFO Ingram then testified about J.P.'s and A.Z.'s deaths caused by counterfeit M30 pills that originated from Navarrete. (ROA.177-88.) The government introduced three photographs of J.P., including one in his football uniform, (*see, e.g.*, ROA.178, 247), and one photograph of A.Z., with his back to the camera, (ROA.184, 259). Next, TFO Ingram testified that following his arrest, Navarrete lied to law enforcement about the conspiracy hindering their ability the get the counterfeit M30 pills off the streets. (ROA.189-90.) And finally, he testified that approximately 1.2 million counterfeit M30 pills containing fentanyl were seized from this investigation. (ROA.192.)

J.P.'s mother then addressed the court detailing how her son's death deeply impacted her, her 9-year-old son who was "doing very badly right now" and was "not able to accept that [J.P. is] dead," and her 5-year-old son who "stands in front of his alt[a]r and tells [J.P.] that he misses him and that he loves him and he asks him to be able to see him just one more time." (ROA.205-09.) She concluded by addressing Navarrete, telling him that while she had forgiven him, she hoped he had asked God for forgiveness because "he has no idea of the pain [he caused], a pain that [she did not] even wish on his own mother." (ROA.209.)

The court then heard final arguments from the parties. The government reiterated its request in its departure motion for a sentence of 240 months, arguing that Navarrete's conduct was beyond deplorable given "he was well aware that the pills that he was putting into the community were killing children," but that "he didn't care [and] didn't stop." (ROA.210-13.) Navarrete again requested a 120-month sentence, noting that while he recognized that a higher sentence was appropriate, a 240-month sentence was "too much." (ROA.213-16.)

The court, before pronouncing sentence, used quintessential variance language, stating that when looking at the 18 U.S.C. § 3553(a) factors, the guidelines did not account for Navarrete's conduct in this case. (ROA.217.) It then stated:

> I want to say that this sentence today, when you look at there are two deaths and the physical injuries to all of these children in this case, the sentence I'm going to impose is certainly appropriate for that.

(ROA.217.) The court also stated that in fashioning Navarrete's sentence, it considered punishment, deterrence, protection of the community, Navarrete's failure to cooperate, that there was no plea agreement, and that "it's his conspiracy." (ROA.217-18.)

The court then addressed J.P.'s and V.D.'s mothers, who were both present in the courtroom:

I want to speak to you two mothers that are here today. I cannot imagine the pain. . . . I look at that—you know, that football uniform and that cheerleader uniform and it—it just happens to get stuck in my face every week from my grandchildren, one of whom played football all day Sunday, and I was there, and my granddaughter who is a cheerleader, and reminds me every day of y'all, the two of y'all. I won't forget it. I promise you. I won't forget y'all, and your sweetness to be forgiving. You know, I like to claim because I'm a Christian I can be forgiving but I'm not certain—the Lord would have to beat me over the head to get to the point where you two ladies are. I just—I admire you both very, very much for that.

(ROA.218.) While the court acknowledged Navarrete's "terrible upbringing," it also noted that his conduct was "horrendous, horrible, [and] terrible." (ROA.219.) The court then sentenced Navarrete to 240 months' imprisonment. (ROA.219.) In its statement of reasons, the court checked the box that it was granting an upward departure based on the government's motion. (ROA.301.)

## SUMMARY OF THE ARGUMENT

Navarrete cannot demonstrate that his upwardly varied 240-month sentence—below the 480-month statutory maximum—was substantively unreasonable. Navarrete distributed counterfeit M30 pills laced with fentanyl to minors without a care about the consequences that they may bear. Tragically, the pills he distributed caused the deaths of two minors, J.P. and A.Z. Yet, after learning of their deaths, Navarrete continued distributing the deadly pills to minors. And while Navarrete was in custody on unrelated state

charges, his coconspirator Soliz—after assuring Navarrete that he would "hold down" the drug distribution scheme in his absence—sold the same pills to the same minors, causing the death of a third minor, V.D. Based on these, and other, egregious facts, the district court reasonably determined that a sentence of 240 months was necessary to fulfill the 18 U.S.C. 3553(a) factors.

Navarrete now contends that the court impermissibly relied on V.D.'s death in upwardly departing under USSG § 5K2.1. Not so. A better reading of the record indicates that the court upwardly varied by considering the Section 3553(a) factors and determining that the guidelines did not account for Navarrete's conduct. But even if the court upwardly departed under USSG § 5K2.1, it did so by granting the government's departure motion based only on the deaths of J.P. and A.Z. And to the extent the court erred in upwardly departing under USSG § 5K2.1, such error is harmless as the court could have imposed the same sentence as a variance. Finally, this Court should decline Navarrete's invitation to reweigh the sentencing factors, and it should affirm the sentence.

## ARGUMENT AND AUTHORITIES

**Navarrete's 240-month sentence is substantively reasonable.**

### Standard of Review

Because at sentencing Navarrete argued for a sentence of 120 months, he preserved his contention that a longer sentence (such as the 240-month sentence the district court imposed) is unreasonably long. *See Holguin-Hernandez v. United States*, 589 U.S. 169, 173-75 (2020) (holding that the defendant properly preserved the claim that his 12-month sentence was unreasonably long by advocating for a shorter sentence at sentencing). Therefore, to the extent Navarrete repeats on appeal some of the same arguments he made in the district court for a lesser sentence, this Court reviews the district court's judgment for an abuse of discretion, examining the totality of the circumstances. *United States v. Cortez-Balderas*, 74 F.4th 786, 787 (5th Cir. 2023).

Here, however, Navarrete arguably failed to preserve error, as he raises a different argument on appeal than he did in the district court. *See United States v. Rodriguez*, 15 F.3d 408, 414 (5th Cir. 1994) (reviewing for plain error where sentencing claim raised for the first time on appeal); *see also Holguin-Hernandez*, 589 U.S. at 176 (Alito, J., concurring) (emphasizing that "[a] court cannot address particular arguments or facts not brought to its attention"). In

the district court, Navarrete argued that the court should not consider V.D.'s death because it was not "relevant conduct" under the guidelines, (ROA.168-69, 346-48), whereas on appeal Navarrete makes a different argument that court should not have considered V.D.'s death in upwardly departing under USSG § 5K2.1, (Brief at 18-19). Although plain-error review arguably applies to this newly raised argument, the government assumes Navarrete preserved error because his contention fails under either standard of review.

**Discussion**

The district court did not abuse its discretion—let alone plainly err—in imposing Navarrete's 240-month sentence. Indeed, "review for substantive reasonableness is highly deferential, because the sentencing court is in a better position to find facts and judge their import under the Section 3553(a) factors." *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015).

Moreover, courts do not "require [] 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall v. United States*, 552 U.S. 38, 47 (2007). In fact, even a significant departure from the guidelines does not constitute an abuse of discretion if it is "commensurate with the individualized, case-specific reasons provided by the district court." *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015); *see also United States v. Nguyen*, 854 F.3d 276, 283 (5th Cir. 2017).

When, as here, a sentencing court renders a non-guideline sentence, this Court must defer "to the district court's decision that the [Section] 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51. And a finding of substantive unreasonableness is warranted only if the sentence "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013).

Here, Navarrete claims that the district court imposed a substantively unreasonable sentence in granting an upward departure under USSG § 5K2.1 because it impermissibly relied on the death of V.D. even though Navarrete "played no role in V.D.'s death." (Brief at 18-19.) He also argues that the court improperly assigned "equal weight to both V.D.'s and J.P.'s death[s]." (Brief at 23.) Navarrete's arguments are meritless and unsupported by the record.

First, the best reading of the record is that the district court upwardly varied and appropriately considered all facets of the case—including V.D.'s death—under the Section 3553(a) factors. Second, even if the district court upwardly departed under USSG § 5K2.1, it did so by granting the government's motion which relied solely on the deaths of J.P. and A.Z. But

14

even if it erred in considering V.D.'s death in upwardly departing under USSG § 5K2.1, any error is harmless as the court could have upwardly varied for the same reason. And third, Navarrete's argument about the weight the court placed on the deaths of V.D. and J.P. is entirely speculative and, in essence asks this Court to reweigh the Section 3553(a) factors, which runs contrary to the deferential standard of review for abuse of discretion.

## A. The best reading of the record is that the court upwardly varied and properly considered all facets of the case under the Section 3553(a) factors.

The best reading of the record is that the court upwardly varied, rather than upwardly departed under USSG § 5K2.1. At sentencing, the court never stated that it was imposing a departure or granting the government's motion for departure. (ROA.216-19.) Instead, the court used quintessential variance language when it said that based on the 18 U.S.C. § 3553(a) factors, Navarrete's 60-month guideline did not account for his conduct and listed several Section 3553(a) considerations including the seriousness of the offense, deterrence, and protection of the community as factors supporting the sentence imposed. (ROA.217); *see United States v. De Los Santos*, 668 F. App'x 98, 99 (5th Cir. 2016) (classifying sentence as a variance based on the district court's oral pronouncement, despite the written statement of reasons calling it a departure). While the court's statement of reasons indicated that it upwardly

departed under USSG § 5K2.1, (ROA.301), where there is a conflict between the oral pronouncement and the judgment, the oral pronouncement—here imposing an upward variance—controls. *See United States v. Martin*, 119 F.4th 410, 415 (5th Cir. 2024) ("If there is an actual conflict between the district court's oral pronouncement of [the] sentence and the written judgment, the oral pronouncement controls." (cleaned up)).

The court had ample reasons to impose a significant upward variance from the guidelines including:

- The parties' agreement that the guidelines did not properly account for Navarrete's egregious conduct in this case. (ROA.122, 214, 337, 350.)

- Navarrete's conduct involved distributing counterfeit M30 pills containing fentanyl to juvenile drug dealers who, in turn, sold the pills to minors in Carrollton, Texas, middle and high schools. (ROA.164, 265.)

- The uncontested fact that the conspiracy that Navarrete joined and actively participated in resulted in the deaths of minors.

  - Navarrete distributed counterfeit M30 pills that caused the deaths of two minors, J.P. and A.Z. (ROA.178-89, 346); *see United States v. Hudgens*, 4 F.4th 352, 358 (5th Cir. 2021) ("[N]othing prevents a sentencing court from considering the fact that death resulted from an offense.").

  - Navarrete's coconspirator Soliz—who agreed to "hold down" the drug distribution scheme while Navarrete was incarcerated by distributing counterfeit M30 pills to the same juvenile dealers— sold counterfeit M30 pills that caused the death of a third minor, V.D. (ROA. 160, 164-68, 196); *see*

> *Hudgens*, 4 F.4th at 358. It was entirely foreseeable to Navarrete that the deadly pills Soliz distributed in his absence could lead to minors dying.

- Navarrete's total indifference to human life, evidenced by his continued distribution of counterfeit M30 pills to minors *after* being informed that J.P. and A.Z. died due to the pills he sold. (ROA.188.)

- Navarrete and his coconspirators distributed counterfeit M30 pills that caused at least six minors to experience nonfatal overdoses, many of whom required NARCAN and hospitalization. (ROA.168-70, 212, 325-31, 346.)

- Navarrete was not deterred from engaging in criminal activity as he was on bond for four separate pending state charges out of Dallas County, Texas at the time he was running the instant drug scheme. (ROA.281.) Indeed, while Navarrete was on home confinement for domestic violence assault charges, he continued to engage in criminal conduct by distributing counterfeit M30 pills to minors out of his home. (ROA.166, 172); *see United States v. Smith*, 440 F.3d 704, 709 (5th Cir. 2006) (noting that the court properly considered the defendant's "release on parole less than one month before the commission of the instant crime" in fashioning its sentence).

- Navarrete impeded law enforcement's ability to get dangerous drugs off the streets and out of schools in Carrollton, Texas, when he provided them with false information following his arrest. (ROA.189-90); *cf. United States v. Smith*, 203 F.3d 884, 891 (5th Cir. 2000) (applying enhancement for obstruction of justice where the defendant "specifically sent the FBI investigators on the trail of unknown suspects, whom she specifically described in order to obstruct the investigation into her own and her coconspirators' involvement").

- Unlike Navarrete, Soliz—who was lower than Navarrete in the drug conspiracy hierarchy—cooperated with law enforcement and received a 15-year sentence. (ROA.160, 212-13); *see United States v.*

*Rider*, 94 F.4th 445, 461 (5th Cir. 2024) (noting that district courts "need not avoid sentencing disparities between codefendants who are not similarly situated").

- Finally, the grave dangers of fentanyl also supported an upward variance. (*See* ROA.217-18.) As a sister circuit pronounced last year: "The nation is in the midst of a shockingly severe fentanyl crisis." *United States v. Roy*, 88 F.4th 525, 532 (4th Cir. 2023). Fentanyl, a synthetic opioid, is "approximately 100 times more potent than morphine and 50 times more potent than heroin as an analgesic." *See* United States Drug Enforcement Administration, *Fentanyl*, https://www.dea.gov/factsheets/fentanyl (last visited Dec. 17, 2024). Troublingly, "by 2021, over two-thirds of U.S. drug overdose deaths involved fentanyl and similar synthetic opioids, with these drugs causing nearly 23 times the number of overdose deaths in 2021 than they did in 2013." *Roy*, 88 F.4th at 532.

When the entirety of the record is considered, it becomes clear that V.D.'s death was just one of many factors in the decision to impose the upward-variance sentence. Indeed, the district court reasonably took into consideration numerous egregious aspects about Navarrete and his offense when it chose to impose sentence. In view of the laundry list of reasons for this upward-variance sentence, each one relevant to a sentencing factor, it is unsurprising that Navarrete provides no cases in which the Court has held in similar circumstances that such a sentence represented an abuse of discretion.

**B.    Even if the court upwardly departed under USSG § 5K2.1, it did so by granting the government's motion, which did not rely on V.D.'s death.**

But even if the record is read more narrowly, as Navarrete posits, to reflect the court granting the government's upward departure motion under USSG § 5K2.1, (*see* ROA.301), that motion clearly relied *only* on the deaths of J.P. and A.Z., and not V.D.'s death.  Specifically, in its "Grounds for Upward Departure" section, the motion listed the applicable grounds for a departure under USSG §§ 5K2.1 and 5K2.2, immediately followed by a description of the deaths of J.P. and A.Z. due to counterfeit M30 pills originating from Navarrete.  (ROA.332-35.)  Notably absent from that section—any mention of V.D.'s death.  (ROA.332-35.)  Because only J.P. and A.Z. were discussed in the section of the motion requesting a departure under USSG § 5K2.1, the government's request for a departure under USSG § 5K2.1 clearly applied *only* to the deaths of J.P. and A.Z.

Navarrete contends otherwise, maintaining that the government requested an upward departure under USSG § 5K2.1 by "pointing to the overdose deaths of three people: V.D., J.P., and A.Z."  (Brief at 16.)  Not so.  First, as noted, the section of the motion requesting a departure under USSG § 5K2.1 did not reference V.D. or V.D.'s death at all.  (ROA.332-35.)  Instead, it only discussed the deaths of J.P. and A.Z.  (ROA.332-35.)  Second, the

government only referenced V.D.'s death in a section of its sentencing memorandum that appeared *before* the request for a departure under USSG § 5K2.1 and *before* USSG § 5K2.1 is ever referenced. (*Compare* ROA.331-35 (listing departure under USSG § 5K2.1 and describing J.P.'s and A.Z.'s deaths), *with* ROA.325-27 (describing V.D.'s death).)

Despite the government's motion relying only on the deaths of J.P. and A.Z. for a departure under USSG § 5K2.1, Navarrete nevertheless argues that the court impermissibly relied on V.D.'s death to upwardly depart. (Brief at 18.) He points to the court's statement about "two deaths," which he claims "zeroed in on" V.D.'s and J.P.'s deaths, and comments addressed to V.D.'s and J.P.'s mothers. (Brief at 18.) Neither support his argument.

First, Navarrete assumes—without any supporting evidence—that the court was referring to V.D. and J.P. (rather than to A.Z. and J.P.) when it said:

> I want to say that this sentence today, when you look at there are *two deaths* and the physical injuries to all of these children in this case, the sentence I'm going to impose is certainly appropriate for that.

(ROA.217 (emphasis added).) But read in context, the *two deaths* the court referenced were almost certainly A.Z.'s and J.P.'s. For starters, the government's departure motion repeatedly referenced A.Z. and J.P.—and not V.D.—as the two minors who died due to the counterfeit M30 pills Navarrete

was distributing.  (*See* ROA.333, 336-37.)  Thus, if the court was granting that departure motion, as Navarrete contends, it would invariably be referring to the *two deaths* mentioned in that motion—A.Z.'s and J.P.'s.  Moreover, TFO Ingram's testimony at the sentencing hearing confirmed that while Navarrete distributed the pills that caused A.Z.'s and J.P.'s deaths, Soliz distributed the pills that caused V.D.'s death.  (*Compare* 182 (J.P.), *and* 185-88 (A.Z.), *with* ROA. 169-170 (V.D.).)  The court would therefore have no reason to refer to V.D.—rather than A.Z.—as the second death caused by Navarrete.

Second, Navarrete fails to tie the court's comments to V.D.'s and J.P.'s mothers with its supposed reliance on V.D.'s death in granting an upward departure under USSG § 5K2.1.  Before rendering its sentence, the court addressed the mothers to express its sympathy for the loss they experienced as a direct result of the conspiracy that Navarrete joined and actively participated in.  (ROA.218.)  It is clear the court addressed V.D.'s and J.P.'s mothers because they were the only parents in the courtroom of minors who died due to drugs distributed by members of the conspiracy.  (ROA.218 ("I want to speak to you two mothers that are here today.").)  Indeed, the court certainly would have also addressed A.Z.'s mother, had she been present in the courtroom too.  Regardless, Navarrete does not tie the court's statements to the mothers to its decision to upwardly depart.  The court did not mention V.D.

when it issued its sentence, nor was V.D.'s death mentioned in the statement of reasons as a rationale for the court's departure.  (ROA.219, 301.)  Without *any* evidence tying the court's statements to its departure decision, Navarrete fails to establish that the court improperly relied on V.D.'s death in departing under USSG § 5K2.1.

In sum, to the extent the court departed under USSG § 5K2.1, it did so by granting the government's motion which relied *only* on the deaths of J.P. and A.Z.

### i. Any error in departing under USSG § 5K2.1 is harmless.

But even if the court erred in granting an upward departure under USSG § 5K2.1 by relying, in part, on V.D.'s death, because the court could have imposed that same sentence by upwardly varying, *see supra* Section-A—which it clearly intended to do—any error is harmless.  *See United States v. Bryson*, 838 F. App'x 64, 67 (5th Cir. 2020) (finding harmless any error in the court upwardly departing where the record is clear the court intended to impose an above-guidelines sentence).

### C. This Court should reject Navarrete's invitation for it to reweigh the Section 3553(a) factors.

Finally, Navarrete argues that the court impermissibly weighed J.P.'s and V.D.'s deaths "equally," even though Navarrete "played no role in V.D.'s death."  (Brief at 19.)  At the outset, Navarrete's claim that he had no role in

V.D.'s death cannot be squared with the significant evidence to the contrary. While true, Soliz—not Navarrete—sold V.D. the deadly drugs that killed her, V.D.'s death was entirely foreseeable to Navarrete given (1) Navarrete was the leader of the south Carrollton network of the drug conspiracy, (2) Navarrete oversaw Soliz in the conspiracy's hierarchy, (3) Soliz told Navarrete that he would "hold down" the drug distribution scheme while Navarrete was in custody,[6] and (4) Soliz obtained the counterfeit M30 pills laced with fentanyl from the same source of supply he had been introduced to by Navarrete. (ROA.160, 164-70, 196.) Thus, as described *supra* pp. 16-17, it was entirely appropriate for the court to consider V.D.'s death under the Section 3553(a) factors.

Second, Navarrete provides *no* record evidence to substantiate his claim—premised entirely on speculation—that the court placed equal weight on the deaths of J.P. and V.D. In the absence of any showing that the district court clearly erred in its balancing of the sentencing factors, it becomes evident that Navarrete's appeal is merely an invitation to have the Court step into the district court's station, reweigh the sentencing factors, and come to a conclusion that is more favorable to him. This Court has repeatedly warned

---

[6] Indeed, Soliz's role was to "maintain the network and keep it established" while Navarrete was in custody. (ROA.166.)

that it does not accept such invitations, even when it considers the sentence imposed "severe." *See, e.g., United States v. Oladimeji Seun Ayelotan,* 917 F.3d 394, 409 (5th Cir. 2019).

## **CONCLUSION**

This Court should affirm the judgment.

Respectfully submitted,

Leigha Simonton
United States Attorney

*/s/ Daniel Z. Gordon*
Daniel Z. Gordon
Assistant United States Attorney
D.C. Bar No. 1736506
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: (214) 659-8794
daniel.gordon@usdoj.gov

Attorneys for Appellee

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,282 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*/s/ Daniel Z. Gordon*
Daniel Z. Gordon